MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2015 ME 34
Docket:        Yor-14-205
Submitted
 On Briefs:   December 18, 2014
Decided:       March 19, 2015

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, and JABAR, JJ.


IN RE C.A.


JABAR, J.

[¶1]   The mother of C.A. appeals from a judgment of the District Court (Biddeford, *Foster, J.*) terminating her parental rights pursuant to 22 M.R.S. § 4055(1)(B)(2) (2014).[1]  The mother contends that the evidence was not sufficient to support the court's finding of parental unfitness and that the court abused its discretion in determining that termination of her parental rights is in the child's best interest.  We affirm the judgment.

## I.  BACKGROUND

[¶2]   The trial court found the following facts, which are supported by the record.  *See In re Higera N.*, 2010 ME 77, ¶ 2, 2 A.3d 265.  The child was born ten weeks premature on October 12, 2012, and spent the first six weeks of his life in the neo-natal intensive care unit.  On December 31, 2012, after the child had been in his parents' home for approximately four weeks, the mother left the child in the

---

[1]   The father consented to a judgment terminating his parental rights to the child.  He is not participating in this appeal and is mentioned in this opinion only insofar as he is relevant to the mother's appeal.

father's care to attend an appointment. When the mother returned, she noticed bruises on the child's feet. Later that day, the mother took the child to receive a scheduled immunization, and the child's pediatrician observed the bruises and directed her to report them to the Department of Health and Human Services. After speaking with the father, the mother decided to wait until January 2, after the New Year's Day holiday, to call the Department. However, the child's pediatrician did not wait. She reported the bruising on December 31, and the Department immediately dispatched a caseworker to see the child and meet with the parents.

[¶3] Staff at the Spurwink Child Abuse Clinic, who evaluated the child with the parents' consent, determined that the bruises could not have been accidentally inflicted or self-inflicted and that they were most likely caused by inappropriate squeezing of the feet. Based on this assessment, the Department petitioned for a preliminary order of protection, received custody of the child on January 3, 2013, and placed him with his maternal grandmother. On February 8, 2013, the parties agreed to the entry of a jeopardy order. In that order, the court accepted Spurwink's assessment concerning the likely cause of the bruising, and stated, "Though this injury itself might be viewed as relatively minor, this infant is extremely vulnerable and would be at continued risk for further, perhaps more

significant and life threatening injury if he were returned to the home environment where these injuries occurred."

[¶4] From January to August, the parents worked to satisfy the terms of the reunification and rehabilitation plan, *see* 22 M.R.S. § 4041(1-A)(A), (B) (2014), and on August 9, 2013, the Department authorized a trial placement of the child with them. One month later, the Department received a report from the maternal grandmother's wife that the child had bruises on his face that looked like fingerprints.

[¶5] The Department's caseworker responded to the report by immediately making an unannounced visit to the family home. When the caseworker asked to see the child, the mother told her that the child had fallen against the coffee table on September 5 and had bruises on his face. The father then told the mother not to lie for him and related that, while he had been alone with the child on September 5, the child had fallen while standing at the coffee table, and that he had accidentally inflicted the bruises by grabbing the child's face in an attempt to break the child's fall. The mother apologized for being dishonest and stated that she had been afraid that the father would be blamed for the injuries.

[¶6] The parents had not sought medical attention for the child's facial bruises, and from September 5 to September 9, had kept the child home from

4

daycare and rescheduled his appointments. The mother told the caseworker that she did this to prevent others from seeing the child's facial bruises.

[¶7] The caseworker immediately took the child to Spurwink for a second examination. After that examination, Spurwink's staff concluded that the bruises were caused by a high velocity injury, likely a slap, to the child's face. Based on Spurwink's assessment, the Department immediately ended the child's placement with the parents and returned the child to the maternal grandmother.

[¶8] Even after receiving the results of Spurwink's examination, the mother continued to maintain that the father had accidentally injured the child by breaking his fall. On October 11, 2013, the Department filed a petition to terminate both parents' parental rights. In February 2014, three weeks before the scheduled hearing on the petition for termination of parental rights (TPR), the mother informed the Department's caseworker that she had broken up with the father.

[¶9] When asked at the TPR hearing about the first injury, the bruises on the child's feet, the mother testified that she had asked the father whether he had squeezed the child's feet, and that the father had told her he became frustrated when the baby cried. This was the first time that the mother provided this information to either the guardian ad litem or the Department. When asked about the second injury, the child's facial bruises, the mother testified that the father had discouraged her from bringing the child to daycare or reporting the bruises to the

Department. She testified that her biggest concern should have been the child's injury but that she had been more concerned about the child being taken away. The mother testified that she had recently begun to question whether the father might have inflicted the injuries because he was the only one present when they occurred, and that she had come to believe that the father was responsible for the child's injuries.

[¶10] At the time of the TPR hearing, the child had spent most of his life with the grandmother and was doing well in her home. The grandmother testified that she and her wife were willing to adopt the child, and both the Department and guardian at litem expressed support for the adoption.

[¶11] On April 2, 2014, the court terminated the mother's parental rights to the child based on its findings, by clear and convincing evidence, that the mother is unwilling or unable to protect the child from jeopardy and these circumstances are unlikely to change within a time reasonably calculated to meet the child's needs, and that termination of the mother's parental rights is in the child's best interest. *See* 22 M.R.S. § 4055(1)(B)(2)(a), (b)(i). The mother timely appealed. *See* 22 M.R.S. § 4006 (2014); M.R. App. P. 2(b)(3).

## II. DISCUSSION

[¶12] When evaluating the sufficiency of the evidence supporting the court's finding of parental unfitness, we review the court's factual findings for

clear error. *In re H.C.*, 2013 ME 97, ¶ 11, 82 A.3d 80. With respect to the court's best interest determination, we review the court's factual findings for clear error and its ultimate conclusion for an abuse of discretion. *In re A.H.*, 2013 ME 85, ¶ 16, 77 A.3d 1012. If the court's factual findings are supported by competent record evidence, we must sustain them. *In re M.S.*, 2014 ME 54, ¶ 13, 90 A.3d 443.

[¶13] Here, competent record evidence demonstrates that the mother failed to respond appropriately to the child's bruises, which, as the court noted in its termination judgment, were "'sentinel injuries,' injuries often observed in children who later sustained severe injury." The mother failed to recognize the risk that the father posed to the child. She did not seek medical attention for the child's injuries or report them to the Department, but instead took affirmative steps to keep them from being discovered. Until the eve of the TPR hearing, she prioritized her relationship with the father over the child's need for safety and refused to consider the possibility that the father was responsible for the child's injuries, even though he was alone with the child when the injuries occurred and both medical evaluations indicated that his explanations for the injuries were not plausible. Although the injuries themselves were not life threatening, they were injuries *inflicted* on a very young and extremely vulnerable child, and were properly deemed to create jeopardy. Sufficient evidence thus supports the court's finding,

by clear and convincing evidence, that the mother is unwilling or unable to protect the child from jeopardy and that these circumstances are unlikely to change within a time that would meet the child's needs. *See id.* ¶ 14.

[¶14] The record also contains competent evidentiary support for the court's findings that the child has spent the majority of his life in the grandmother's home, that the grandmother and her wife are able to meet the child's needs, and that they are willing to adopt him. In light of the child's stable placement with the grandmother and the mother's consistent failure to recognize and respond appropriately to a threat to the child's safety, the court did not abuse its discretion in concluding that termination of the mother's parental rights is in the child's best interest. *See id.* ¶ 15.

The entry is:

> Judgment affirmed.

---

**On the briefs:**

> Wendy Moulton Starkey, Esq., Rose Law, LLC, York, for appellant mother
>
> Janet T. Mills, Attorney General, and Meghan Szylvian, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Biddeford District Court docket number PC-13-01