MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:      2018 ME 50
Docket:        Cum-17-436
Submitted
 On Briefs:    February 26, 2018
Decided:       April 10, 2018

Panel:         ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

IN RE CHILD OF JAMES R.

HJELM, J.

[¶1]  James R. appeals from an order of the District Court (Portland, *Powers, J.*) terminating his parental rights to his child based on the court's conclusions that he is unfit because he is unable to "meet his son's special needs and take responsibility for him in a reasonable time to meet those needs" and to "protect his son from jeopardy in a reasonable time to meet his needs," and that termination is in the child's best interest.  *See* 22 M.R.S. § 4055(1)(B)(2)(a), (b)(i)-(ii) (2017); M.R. App. P. 2B(c).  On appeal, the father contends that the court erred in its parental unfitness and best interest determinations and that he was denied due process.  We affirm the judgment.

## I. BACKGROUND

[¶2]  After a two-day termination hearing, the court issued a judgment containing the following factual findings, which are supported by the record. *See In re Evelyn A.*, 2017 ME 182, ¶ 4, 169 A.3d 914.

[¶3]  The child was born premature and drug-affected.  He remained hospitalized in neonatal intensive care for six weeks after his birth.[1]  Upon discharge, he was placed in the custody of the Department of Health and Human Services and lived in foster care because his parents knew that they were unable to care for him.  He has resided in the same foster home since then.

[¶4]  Up until several days before the child was born, the father had been using numerous drugs, including heroin, cocaine, amphetamines, and marijuana, in addition to alcohol.  Since then, he has maintained sobriety.  He attends Narcotics Anonymous meetings and has participated in substance abuse counseling since February of 2016.  The father has been diagnosed with post-traumatic stress disorder, anxiety, and depression, and, as part of a reunification plan, he has attended mental health counseling that has a domestic violence component.  Since May of 2016, the father has worked with a case manager to coordinate services that include a parenting coach who

---

[1]  Although the child's birth date is not specified in the judgment, the record indicates that the child was born in December of 2015.

began working with the father in January of 2016. Overall, the father has been cooperative with the Department and has participated in the reunification services provided to him.

[¶5] The father has had regular visitation with the child, beginning with supervised contact at an agency and foster home, and progressing to some unsupervised contact, including overnights toward the end of 2016. Because the visits went well and the father had demonstrated progress in services, in early 2017 the parties formulated a plan to allow greater unsupervised contact that would lead to a trial placement with the father beginning on January 27, 2017. The ultimate plan was reunification of the father and the child.

[¶6] The court described what happened next.

Unfortunately, the serious incident of January 17, 2017 directly interfered with the reunification plan, and the trial placement has never occurred. Around 11:00 a.m. on January 17, 2017 the father's parent educator . . . appeared at the father's apartment as part of the visit there between father and [the child]. [The parent educator] noticed that [the child] seemed normal acting. However, he then saw red bruising on both of [the child's] cheeks. When he was asked about this, the father described two incidents the day before which might explain the bruises. [The father] was putting a new chair together, and [the child] was pushing a toy and somehow fell. The second involved both being in the shower and [the child] was at the back of the tub and slipped. The father cannot recall seeing either event but was present and assumed two falls occurred from [the child's] reaction. The father was aware of the bruising on January 17 before [the parent educator] arrived. The father did not believe either incident was serious

because [the child] slept all night thereafter. He has denied slapping or otherwise causing the facial bruises since being questioned on January 17, 2017. He was the only adult there when the bruising occurred.

[The parent educator] called DHHS, which immediately scheduled an abuse evaluation for [the child] at the Spurwink Child Abuse Program. That occurred on the afternoon of January 17, 2017, with a follow up visit that took place on January 20, 2017. Numerous photographs taken at the evaluation document the obvious bruising. The father gave the clinic the same explanation for [the child's] two falls.

The experienced nurse practitioner at the child abuse clinic that evaluated [the child] is "very convinced" that the father's explanation for the bruises' existence is not correct. Spurwink concluded that the location and appearance of the bruising "is most consistent with an inflicted injury." The nurse practitioner cannot state the mechanism of injury except to say that it is typically caused by a flexible slap or strike, which can be by hand. The [nurse practitioner] told the father at the evaluation that his explanations are not plausible, and [the father] had no further comment. Thus, accidental falls suggested by [the father] are highly unlikely. The clinic expressed concern for further injury to the child if the child went with his father, and [the child] was placed in foster care. The clinic recommended supervised contact between father and son. The court finds the child abuse expert's opinions persuasive and seriously concerning as to this child's safety.

[¶7] After this development, the Department informed the father that it could provide him with appropriate services, including services related to anger management, if he took responsibility for the injuries.[2] The father,

---

[2] During her testimony, the Department's caseworker explained that although the agency had provided "strong support" to the father, his unwillingness to acknowledge his responsibility for the

however, has never admitted wrongdoing regarding the child's injuries and in fact testified at the termination hearing that he was not responsible for them. Because the child was injured while in the father's care, the father's subsequent contact with the child has been supervised.

[¶8]  Since coming into the Department's custody at six weeks old, the child has lived with an experienced foster parent.  With support in the record, the court found that the child "has not been easy to raise under all the circumstances."  When the child was discharged from the hospital after his birth, he was hypertonic and overstimulated, and cried a lot and slept little.  He has received occupational and physical therapy.  He continues to have problems with food sensitivity and impulse control, although the latter is improving.

## II.  DISCUSSION

[¶9]  We address in turn the father's challenges to the court's determination of parental unfitness and the child's best interest and his contention that he was denied due process.

---

child's injuries meant that the Department could not provide services that would address the reasons underlying the assaultive conduct.  She testified that, as a result, "I kind of had my hands tied, so I had to move forward.  Especially given how long we had been involved with the family."

6

## A.    Grounds for Termination

[¶10]  The father first argues that the court erred by concluding that he is unfit as a parent to the child.

[¶11]  Absent a parent's consent to termination, in order to terminate parental rights the court must find, by clear and convincing evidence, at least one of the four statutory grounds of parental unfitness.  *See* 22 M.R.S. § 4055(1)(B) (2017).  Here, the court concluded that the Department proved two forms of parental unfitness: that the father has been unable to protect the child from jeopardy and will be unable to do so within a time reasonably calculated to meet the child's needs; and that the father has been unable to meet the child's special needs and take responsibility for him within a time reasonably calculated to meet those needs.  *See id.* § 4055(1)(B)(2)(b)(i), (ii). We review for clear error the court's findings of fact on parental unfitness.  *See In re Hope H.*, 2017 ME 198, ¶ 8, 170 A.3d 813.  We "will reverse a finding only if there is no competent evidence in the record to support it, if the fact-finder clearly misapprehends the meaning of the evidence, or if the finding is so contrary to the credible evidence that it does not represent the truth and right of the case."  *In re Cameron B.*, 2017 ME 18, ¶ 10, 154 A.3d 1199 (quotation marks omitted); *see also In re Evelyn A.*, 2017 ME 182, ¶ 31, 169 A.3d 914.

[¶12]  The court concluded, with support in the evidence, that the father "does not have the temperament control and good judgment needed to parent [the child] safely. . . . That [the father] remains untrustworthy and at risk of inflicting harm on [the child] is the bottom line in this case."  In its judgment, the court acknowledged the father's "partial progress toward reunification" from the time of the child's birth until the January 2017 incident where the child was injured while in his exclusive care—and merely days away from a trial placement of the child in his residence.  The court reasoned, however, that the progress made by the father did "not overcome the danger he still poses to [the child] were they to be alone."  This assessment is grounded on the court's rejection of the father's claim that he was not responsible for the injuries, because the father's explanations were "unsupported by the physical evidence" and because "[t]he evidence clearly shows he was the only plausible cause of his son's inflicted facial injuries in January 2017, despite his denials."[3]  The

---

[3]  Although the court's judgment included a statement that it was "probable" that the father inflicted injuries on the child, the judgment, read as a whole, makes clear that the court made its findings based on the correct standard of proof, namely, clear and convincing evidence, *see* 22 M.R.S. § 4055(1)(B)(2) (2017), which means persuasion to a high level of probability. *See In re Thomas D.*, 2004 ME 104, ¶ 21, 854 A.2d 195.  In particular, the court found that the father's benign explanation for the injuries was "highly unlikely" and that the evidence "clearly" established that the father inflicted the injuries.  And the court ultimately and explicitly concluded that the Department proved the father's unfitness overall by clear and convincing evidence.

The father also challenges an isolated finding that the father was not candid in his testimony about the reason he was told to leave a sober housing.  There is evidence, however, that the father was not fully forthright with the guardian ad litem about that situation, and in any event, the judgment makes

8

evidence fully supports the court's assessment of the evidence, which includes expert testimony that the injuries were inflicted and could not have happened as described by the father. *See Adoption of T.D.*, 2014 ME 36, ¶ 16, 87 A.3d 726 (stating that "credibility determinations are left to the sound judgment of the trier of fact" (quotation marks omitted)); *In re Cameron B.*, 2017 ME 18, ¶ 10, 154 A.3d 1199.

[¶13] Given these and other findings made by the court, the court did not err by determining that the father is unable to "meet his son's special needs and take responsibility for him in a reasonable time to meet those needs" and is unable to "protect his son from jeopardy in a reasonable time to meet his needs." *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i), (ii); *In re Damein F.*, 2017 ME 205, ¶¶ 5, 12, 171 A.3d 1149 (affirming a court's decision to terminate parental rights even where the father had "done remarkably well" in his efforts to reunify but could not, in a time reasonably calculated to meet the child's needs, take responsibility for or protect the child from jeopardy (quotation marks omitted)).

---

evident that the court found that the father was responsible for the child's injuries—which is the central factual aspect of this case—because the medical evidence was persuasive. Therefore, even if the court's view of the evidence relating to the father's sober housing was incorrect, the error is harmless. *See In re Caleb M.*, 2017 ME 66, ¶¶ 24-26, 159 A.3d 345.

[¶14]    The father also challenges the court's determination that termination of parental rights is in the child's best interest.  With respect to a best interest determination, "we review the court's factual findings for clear error and its ultimate conclusion for an abuse of discretion."  *In re C.A.*, 2015 ME 34, ¶ 12, 113 A.3d 1098.  In a termination case, the court weighs "the best interest of the child, the needs of the child, including the child's age, the child's attachments to relevant persons, periods of attachments and separation, the child's ability to integrate into a substitute placement or back into the parent's home and the child's physical and emotional needs."  22 M.R.S. § 4055(2) (2017).  The purposes of the termination statute include "[e]liminat[ing] the need for children to wait unreasonable periods of time for their parents to correct the conditions which prevent their return to the family" and "[p]romot[ing] the adoption of children into stable families rather than allowing children to remain in the impermanency of foster care."  22 M.R.S. § 4050(2), (3) (2017).

[¶15]    Here, the court determined the permanency plan for the child to be adoption.  Although finding that the father had made some strides toward reunification, the court ultimately found that "[h]e has not generated trust in his ability to maintain control and provide safe care for his very needy son," a

finding supported by competent record evidence. Given the child's circumstances—including the father's demonstrated inability to appropriately and safely care for the child, as shown by an act of violence against the child committed by the father after having received services for a considerable period and shortly before a planned trial placement; the child's placement in foster care for all but the first six weeks of his life; and, as the court found, the importance of providing this child with a "stable, safe, and caring home"—the court did not abuse its discretion by concluding that termination of parental rights is in the child's best interest.

B.     Due Process

[¶16] The father finally argues that the termination judgment should be set aside because he was denied due process in two respects. The father did not raise these issues below and thereby deprived the trial court of an opportunity to address any challenge of merit, and therefore he has not preserved a due process challenge for appellate review except, at most, for obvious error. *In re Anthony R.*, 2010 ME 4, ¶ 8-9, 987 A.2d 532. Nonetheless, even if the father had preserved his due process contentions and allowed for de novo review, *see In re Robert S.*, 2009 ME 18, ¶ 12, 966 A.2d 894, those claims would be unavailing because they are without merit.

[¶17] In termination cases, where fundamental interests are at stake, "due process requires: notice of the issues, an opportunity to be heard, the right to introduce evidence and present witnesses, the right to respond to claims and evidence, and an impartial fact-finder." *Id.* ¶ 14 (quotation marks omitted).

[¶18] The father first contends that he was denied due process because his parental rights were terminated based largely on evidence of the incident where he injured the child, which, he asserts, had not been adjudicated as a jeopardy issue. As a factual matter, the father is wrong because the January 2017 incident *was* subject to judicial adjudication before the termination petition was even filed. On February 7, 2017—three weeks after the incident—the father *agreed* to a judicial review and permanency planning order, *see* 22 M.R.S. §§ 4036, 4038 (2017), that expressly referred to the child's "injuries that were found by Spurwink to be inflicted." Further, the Department's termination petition, filed in early March of 2017, explicitly invoked the January 2017 incident as a ground for terminating the father's parental rights. And at the termination hearing itself, which was held in August of 2017, the father had full opportunity to challenge the Department's evidence that he inflicted the injuries and to present his own evidence on that point. He did both.

12

[¶19]   More importantly, however, the basis for a termination determination is not artificially limited to circumstances, frozen in time, that existed at some earlier date.  As we have stated, the focus of the termination hearing is "not on the original reason for the children's removal from the parents' home, but on the parents' actions since that time and their ability, contemporaneous with the termination hearing and into the future, to provide safe care for [their children]."  *In re Scott S.*, 2001 ME 114, ¶ 15, 775 A.2d 1144.  The scope of the Department's evidence forming the basis for the judgment and the father's full participation at the hearing were fully consistent with the father's right to due process.[4]

[¶20]   The father also argues that he was denied due process when the Department "abruptly wrote [him] off" after the allegations in the Spurwink report surfaced and, "without a cease reunification order from the court, stymied [his] reunification process."  Again, the father is wrong.

[¶21]   Absent a court order to the contrary, the Department is required to "make reasonable efforts to rehabilitate and reunify the family" of a child removed from the home.  22 M.R.S. § 4036-B(4) (2017).  The Department is

---

[4]  In fact, the protections afforded a parent are *greater* in a termination proceeding than in the jeopardy phase of a child protection case, because the clear and convincing standard of proof necessary for termination is greater than the preponderance standard applicable at a jeopardy hearing.  *Compare* 22 M.R.S. § 4035(2) (2017), *with* 22 M.R.S. § 4055(1)(B)(2).

permitted to "make any appropriate changes in that plan" after reviewing the progress of the plan with the parent. *Id.* § 4041(1-A)(A)(4) (2017). Any failure by the Department to provide adequate reunification services is not by itself a basis for the court to deny a termination petition, although it is a factor the court may consider in evaluating allegations of the parent's unfitness. *In re Thomas D.*, 2004 ME 104, ¶ 28, 854 A.2d 195.

[¶22] In its judgment terminating the father's parental rights, the court found that the Department had made reasonable efforts to prevent the child's removal from the home by providing an array of services to both parents.[5] That finding is supported by the evidence, including testimony from a departmental caseworker that even after the January 2017 incident, the Department continued to provide services to the father and that the father continued to visit with the child, albeit with supervision. Additionally, in the February 2017 order—again, issued *after* the incident that caused the child's injuries—the father *agreed* that the Department had made reasonable efforts to rehabilitate him and reunify the family. And throughout this proceeding, the father had the

---

[5] Each of the reunification plans, which were issued by agreement, required the father to engage in services, which included—among others—parenting skills and understanding the effect of domestic violence on the child. The last reunification plan, which was issued in June of 2016, recited that he needed to "recognize when [he is] struggling and need[s] help," "demonstrate appropriate problem-solving skills and the ability to adapt to difficult situations," and "not behave violently toward others." Further, the February 2016 jeopardy order explained that, as to the father, jeopardy was based in part on his anger management issues.

opportunity, pursuant to 22 M.R.S. § 4041(1-A)(A)(4), to challenge any changes in the reunification plan, but he did not do so.

[¶23] To the extent that the extent of reunification services implicates a parent's due process rights, the father has demonstrated no error here.

The entry is:

Judgment affirmed.

Amy McNally, Esq., Woodman Edmands Danylik Austin Smith & Jacques, P.A., Biddeford, for appellant father

Janet T. Mills, Attorney General, and Meghan Szylvian, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Portland District Court docket number PC-2015-107
FOR CLERK REFERENCE ONLY