MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2019 ME 123
Docket:        Yor-19-108
Submitted
  On Briefs:   July 18, 2019
Decided:       July 30, 2019

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.

IN RE CHILD OF SCOTT A.

HJELM, J.

[¶1]  Scott A. appeals from a judgment of the District Court (Biddeford, *Sutton, J.*) terminating his parental rights to his child pursuant to 22 M.R.S. § 4055(1)(B)(2)(a), (b)(i)-(ii), (iv) (2018).[1]  The father asserts that the judgment violates his right to due process because the court predicated factual findings that he was involved in illegal drug activity in part on his invocation at trial of his Fifth Amendment privilege against self-incrimination.  We affirm the judgment.

---

[1]  In the same judgment, the court also terminated the mother's parental rights.  Because she has not appealed, we discuss those aspects of the evidence and the procedural record that bear only on the father.

## I. BACKGROUND

[¶2] The following facts are drawn from the court's findings, which are supported by competent record evidence, and from the procedural record. *See In re Child of Shayla S.*, 2019 ME 68, ¶ 2, 207 A.3d 1207.

[¶3] The Department of Health and Human Services first became involved with this family in 2004 due to various reports of abuse and neglect. In March of 2017, the older sibling of the child at issue here reported that the parents were both abusing drugs and selling drugs from the home.[2] The sibling also stated that the child was not attending school and that his needs were not being met.

[¶4] During a departmental caseworker's interview of the child, he reported being very fearful of both of his parents and of activities in the basement of the home. He told the caseworker that he woke up "bawling" each morning, that many people went in and out of the home, that his mother drank

---

[2] The sibling was seventeen years old when she reported that information. The sibling was also a subject of the child protection petition in this case but attained majority shortly after the termination petition was filed as to the child at issue here, and the Department did not seek to terminate the parents' parental rights as to her. *See* 22 M.R.S. § 4052(1) (2018) (stating that a termination petition may be filed as to a "child"); *see also* 22 M.R.S. § 4002(2) (2018) (defining a "child" as a person younger than 18 years old). After the sibling became an adult, an extended care order was issued for her. *See* 22 M.R.S. § 4037-A (2018).

a lot, and that his mother had told him that she wished that she and the child were dead.

[¶5]  Three days after the Department received that information, police were dispatched to the home in response to the mother's report of a domestic violence incident.  When the police arrived, the mother recanted her initial complaint but had visible bruising on her face, reported feeling suicidal, and stated that she had been drinking.  Shortly after, with the father's consent, a safety plan was implemented, and the child began to live with his grandparents.  The child was still living in his grandparents' household when the termination order was issued nearly two years later.[3]

[¶6]  Near the end of March of 2017, the Department filed a child protection petition.  *See* 22 M.R.S. § 4032 (2018).  In the petition, the Department alleged that the child was in jeopardy due to neglect, emotional abuse, and the threat of physical abuse due to the parents' ongoing substance abuse, untreated mental health issues, and exposure to domestic violence.

[¶7]  In July of 2017, the parents agreed to a jeopardy order and judicial review and permanency planning orders (*Cantara, J.*), which placed the child in

---

[3]  The child has lived with his maternal grandparents since at least July of 2017, but the record is not entirely clear whether he initially came to live with them or with his paternal grandparents as part of the March 2017 safety plan.

4

departmental custody.[4] The order required, among other things, that the father engage in substance-abuse and domestic-violence treatment and in other therapy to address his "emotional dysregulation." The order explicitly provided that the therapeutic provider was to be someone approved by the Department. Despite that requirement and his long-standing addiction to a narcotic prescription medication, he subsequently refused to engage in substance abuse treatment except with a person who had not been approved by the Department. After the jeopardy order was issued, the father twice tested positive for cocaine.

[¶8] The Department filed a petition for termination of parental rights in February of 2018. *See* 22 M.R.S. § 4052 (2018). Two months later, while driving his vehicle, the father was stopped by local police officers and Maine Drug Enforcement agents. During the stop, one of the officers observed a container with what appeared to be packets of heroin in the vehicle. The father was arrested and ultimately indicted in federal court for one count of possession of fentanyl and one count of possession of fentanyl with the intent to distribute

---

[4] Although the child began residing with his grandparents in March of 2017, the Department had not sought a preliminary protection order when it filed the child protection petition that month, *see* 22 M.R.S. § 4034(1) (2018), and the record indicates that the child was not placed in departmental custody until the July permanency planning order was issued.

and conspiracy to distribute fentanyl, 21 U.S.C. §§ 841(a)(1), 846 (LEXIS through Pub. L. No. 116-29). The father was later granted pretrial release to attend a month-long residential substance use treatment program. Although he made progress during the program and came to acknowledge that he had been an addict for decades, sometime before mid-July of 2018 he was arrested for a violation of conditions of his supervised release. At the time of the termination hearing, he remained in custody awaiting trial on the drug charges.[5]

[¶9] The court (*Sutton, J.*) held a two-day termination hearing in February of 2019. *See* 22 M.R.S. § 4054 (2018). One of the witnesses was the father.[6] During his testimony, he asserted his privilege against self-incrimination in response to any question regarding the circumstances that led to the pending drug charges and some other drug-related activity. In its judgment, the court drew an inference adverse to the father regarding the issues raised in those questions, *see* M.R. Evid. 513(b); *In re Ryan M.*, 513 A.2d

---

[5] The court was presented with evidence that the arrest resulted from drug-related violations of the conditions of his pretrial release.

[6] For the first day of the hearing, even though the court had issued a transport order for him to attend in person, he was not brought to the courthouse, and the court made arrangements that allowed him to appear telephonically. On the second day of the hearing, the father was present in court.

837, 841-42 (Me. 1986), and ultimately found that he had "committed and was involved in drug trafficking crimes that involved a large amount of fentanyl, and that at least some aspects of his drug distribution crimes took place at the family home, primarily in the basement."

[¶10] In a judgment issued later in February of 2019, the court terminated the father's parental rights to the child. The court found, based on clear and convincing evidence, that the father was unwilling or unable to protect the child from jeopardy or to take responsibility for the child and that those circumstances were unlikely to change within a time reasonably calculated to meet the child's needs, and that the father had failed to make a good faith effort to rehabilitate and reunify with the child. *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i)-(ii), (iv). The court also determined that termination of the father's parental rights is in the best interest of the child. *See* 22 M.R.S. § 4055(1)(B)(2)(a). The father filed a timely appeal from the judgment. *See* 22 M.R.S. § 4006 (2018); M.R. App. 2B(c)(1).

## II. DISCUSSION

[¶11] The father contends that he "was denied a fair hearing" because he "was powerless to exercise his right to 'respond to claims and evidence' . . . without giving up his constitutional right to incriminate himself

[*sic*]," and that the court's factual findings regarding his criminal involvement with drugs, based on his assertion of his privilege against self-incrimination, violated his right to due process. As the father recognizes, the claim of error was not preserved, so we review the judgment for obvious error. *See In re Child of James R.*, 2018 ME 50, ¶ 16, 182 A.3d 1252 ("The father did not raise these issues below and thereby deprived the trial court of an opportunity to address any challenge of merit, and therefore he has not preserved a due process challenge for appellate review except, at most, for obvious error.").

[¶12] "As applied to a termination hearing, balancing the interests, where significant rights are at stake, due process requires[] notice of the issues, an opportunity to be heard, the right to introduce evidence and present witnesses, the right to respond to claims and evidence, and an impartial factfinder." *In re Adden B.*, 2016 ME 113, ¶ 7, 144 A.3d 1158 (quotation marks omitted). Each of these elements of due process was satisfied here. The father was provided with notice of the issues, and, in fact, his assertion to us that he "had no way of knowing that he might need to present witnesses as to his innocence of criminality" is belied by the motion he filed to continue the termination hearing on the ground that the pendency of the criminal case "could cause Fifth Amendment consequences" in this matter. Additionally, the

father was represented by counsel and had a full opportunity to testify, to examine witnesses, and to respond to the evidence and the claims at issue at a hearing held before an impartial adjudicator. The father's assertion that he was denied a fair hearing is without merit.

[¶13] It is well-settled that in civil actions—including child protection proceedings—"the fact finder may draw an appropriate inference from a party's claim of the privilege against [self-incrimination]." M.R. Evid. 513(b); *see also In re Ryan M.*, 513 A.2d at 841-42. In those cases, "a party's claim of the privilege against self-incrimination is a proper subject of comment by a judge or by counsel." M.R. Evid. 513(a). The court did not commit error—much less obvious error—by drawing an adverse inference from the father's invocation of his Fifth Amendment privilege.

[¶14] The court also committed no error by considering evidence of the father's long history of substance use and his drug-related criminal conduct, established in part by the adverse inferences discussed above, as factors that contributed to the determination of parental unfitness.[7] *See In re Logan M.*,

---

[7] The father does not challenge the court's determination that termination is in the child's best interest. In any event, on this record, such a challenge would have been unavailing. *See In re Children of Christopher S.*, 2019 ME 31, ¶ 7, 203 A.3d 808 (stating the standard of review applicable to a best-interest determination).

2017 ME 23, ¶ 3, 155 A.3d 430. As the father acknowledges, the court "did not base its decision to terminate his parental rights solely on evidence of [the father]'s criminal drug involvement." And even beyond that, based on record evidence, the court made findings of the father's intransigent drug addiction, his re-arrest and his expectation that he would be sentenced to a five-year prison term for the federal drug charges, his perpetration of domestic violence, and his inability to accept responsibility for his actions.[8] Pointedly, the court drew on the father's own testimony when he was asked how he planned to parent the child. After initially responding simply that he was in jail, he told the court, "I don't know how to even answer that."

[¶15] On this record, the court was entitled to conclude—as it did—that the father was parentally unfit within the meaning of at least one statutory definition of that legal standard. *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i)-(ii), (iv); *In re Arturo G.*, 2017 ME 228, ¶ 11, 175 A.3d 91; *In re K.M.*, 2015 ME 79, ¶ 9, 118 A.3d 812 ("Where the court finds multiple bases for unfitness, we will affirm if

---

[8] Appropriately, the court made clear that its determination of parental unfitness was not predicated solely on the father's incarceration and the prospect of years-long incarceration. Rather, the court considered that circumstance as a factor, combined with others, that led to a more comprehensively-based conclusion that the father is parentally unfit within the meaning of section 4055(1)(B)(2)(b). *See In re Cody T.*, 2009 ME 95, ¶ 28, 979 A.2d 81 ("In considering the parental fitness of an incarcerated parent, the court's focus is not on the usual parental responsibility for physical care and support of a child, but upon the parent's responsibility or capacity to provide a nurturing parental relationship using the means available." (quotation marks omitted)).

any one of the alternative bases is supported by clear and convincing evidence."

(quotation marks omitted)).

The entry is:

Judgment affirmed.

---

Seth Berner, Esq., Portland, for appellant father

Aaron M. Frey, Attorney General, and Hunter C. Umphrey, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Springvale District Court docket number PC-2017-11
FOR CLERK REFERENCE ONLY