# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 53692

| | | |
|---|---|---|
| In the Matter of: John Doe I, A Child Under Eighteen (18) Years of Age. | ) ) | |
| STATE OF IDAHO, DEPARTMENT OF HEALTH AND WELFARE, | ) ) ) | Filed: June 18, 2026 |
| Petitioner-Respondent, | ) ) | Melanie Gagnepain, Clerk |
| v. | ) ) ) | THIS IS AN UNPUBLISHED OPINION AND SHALL NOT BE CITED AS AUTHORITY |
| JOHN DOE (2026-06), | ) ) | |
| Respondent-Appellant. | ) ) | |

Appeal from the Magistrate Division of the District Court of the Sixth Judicial District, State of Idaho, Bannock County. Hon. Anson L. Call, II, Magistrate.

Judgment and decree terminating parental rights, affirmed.

Merrill and Merrill, Chartered; Mary E. Shea, Pocatello, for appellant.

Hon. Raúl R. Labrador, Attorney General; Jason R. Chandler, Deputy Attorney General, Pocatello, for respondent.

---

HUSKEY, Judge

John Doe appeals from the magistrate court's judgment and decree terminating his parental rights to John Doe I (Child). Doe argues the magistrate court erred by terminating his parental rights without addressing the due process argument that his parental rights were terminated based on facts never adjudicated or tasks not included in the case plan, and the Idaho Department of Health and Welfare (Department) did not establish by clear and convincing evidence that: Doe abused Child; Doe neglected Child; and terminating Doe's parental rights is in the best interests of Child. The Department argues there is substantial and competent evidence supporting the magistrate court's conclusions regarding the alternate statutory bases upon which Doe's parental rights could be terminated and terminating Doe's parental rights is in the best interests of Child. For the reasons stated below, we affirm the judgment and decree terminating Doe's parental rights.

1

## FACTUAL AND PROCEDURAL BACKGROUND

This case is one of three cases that were consolidated in the magistrate court but are not consolidated on appeal. The parties in the consolidated cases in the magistrate court are Doe, his wife (Stepmother),[1] and the mother of Child (Mother). Doe and Mother are the biological parents of Child. Stepmother is the biological parent of two other minor children (Children), who are not biologically related to Doe or Mother.[2]

Child was born in April 2022 and lived with Mother and Mother's parents. When Child was approximately five months old, Mother and Doe's relationship ended, and Mother began dating another man. Mother and Child moved in with Mother's boyfriend in December 2022. The three then moved to Oregon, and Mother and her boyfriend married. In July 2023, the Oregon Department of Children and Family Services (Oregon DCFS) opened an investigation into Mother and her husband over allegations that Child had been burned and was given cold showers as a punishment during potty training. It was also reported to the Oregon DCFS that Child had been burned on his hand.

Oregon DCFS had ongoing safety concerns for Child, but Mother and her husband became uncooperative with the Oregon investigation. Because of the safety concerns and lack of cooperation, Oregon DCFS placed Child with Doe in Idaho. At that time, Doe lived with Stepmother and Children.

A short time after Child was placed with Doe and Stepmother, Stepmother called Doe and informed him that Child was limp and not moving correctly. Child was taken to the emergency room where Doe and Stepmother reported to the medical providers that Child had also been vomiting and experiencing diarrhea. No brain scans of Child were performed, and he was sent home with nausea medicine and a diagnosis of respiratory syncytial virus (RSV). The following day, Child returned to the emergency room after Stepmother reported to Doe that Child was unable to stand and use the right side of his body. This time, a computed tomography (CT) scan was

---

[1] Doe and Stepmother were in a dating relationship but later married during the Child Protective Act case. For ease of reference, we will refer to Doe's wife as Stepmother regardless of their marital status at any given time.

[2] Mother's parental rights to Child were also terminated; that appeal is pending in Docket No. 53666. Stepmother's parental rights to Children were also terminated; that appeal is pending in Docket No. 53700.

performed. The CT scan revealed: bilateral frontal hygromas (fluid in the brain), an enlarged ventricular system, and an acute 4 to 5 mm subdural hematoma in the left frontal region (a collection of blood in the brain). Medical providers also noted that Child had bruising on his cheeks; Doe and Stepmother reported that the bruising was the result of Stepmother's daughters throwing toys at Child.

The emergency room doctor who examined Child, Dr. Curtis Sandy, testified that the neuro deficits associated with a brain bleed most often occur within twenty-four to forty-eight hours of the onset of the brain bleed. After reviewing the CT scan, Dr. Sandy testified that, in his opinion, the blood in Child's brain was less than twenty-four to forty-eight hours old due to the large area of acute blood present in the brain with a smaller area of mixed density blood. Because the brain bleed was so large and Child was experiencing neurological symptoms, it was determined that surgery may be required. There were no pediatric neurologists nearby, so Child was flown to a hospital in Salt Lake City, Utah. Additional scans were completed at that hospital, including a magnetic resonance imaging (MRI). Photographs of Child were taken, which showed bruising on Child's cheeks, forehead, and left arm. The Department filed a CPA petition alleging Child was abused, abandoned, neglected, homeless, or lacked a stabled home environment; Child was subsequently placed into the temporary custody of the Department. Following an adjudicatory hearing, the Department was granted continued temporary custody of Child, and a case plan was approved and adopted for Doe. Thereafter, the Department filed a petition for termination of Doe's parental rights and adoption of Child.

Following a termination trial, the magistrate court found that Doe neglected Child on three alternate bases: (1) Child was without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being, because of the conduct or omission of Doe and/or Doe's neglect or refusal to provide them (I.C. §§ 16-2005(1)(a)(ii), 16-2002(3)(a) and 16-1602(31)(a));[3] (2) Doe was unable to discharge his parental responsibilities and, as a result of such inability, Child lacks the parental care necessary for his health, safety, or well-being (I.C. §§ 16-2005(1)(a)(ii), 16-2002(3)(a) and 16-1602(31)(b)); and (3) Doe failed to comply with the magistrate court's orders or case plan, Child had been in the temporary custody of the Department

---

[3] Although the magistrate court cites to I.C. §§ 16-2005(1)(b) and 16-2002(30)(a), it is clear it was referring to I.C. §§ 16-2002(3)(a) and 16-1602(31)(a).

for fifteen[4] of the most recent twenty-two months, and reunification had not been accomplished (I.C. §§ 16-2005(1)(a)(ii) and 16-2002(3)(b)). The magistrate court also found Doe was unable to discharge his parental responsibilities and such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals, and/or well-being of Child (I.C. § 16-2005(1)(a)(iv)) and that termination of Doe's parental rights is in Child's best interests. Doe appeals.

## II.

## STANDARD OF REVIEW

On appeal from a decision terminating parental rights, this Court examines whether the decision is supported by substantial and competent evidence, which means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Doe v. Doe*, 148 Idaho 243, 245-46, 220 P.3d 1062, 1064-65 (2009). The appellate court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order that parental rights be terminated. *Id.* The Idaho Supreme Court has also said that the substantial evidence test requires a greater quantum of evidence in cases where the trial court's finding must be supported by clear and convincing evidence than in cases where a mere preponderance is required. *State v. Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006). Clear and convincing evidence is generally understood to be evidence indicating that the thing to be proved is highly probable or reasonably certain. *Roe v. Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006). Further, the magistrate court's decision must be supported by objectively supportable grounds. *Doe*, 143 Idaho at 346, 144 P.3d at 600.

This Court must conduct an independent review of the record but must draw all reasonable inferences in favor of the magistrate court's judgment, as the magistrate court has the opportunity to observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive, and to judge the character of the parties. *In Interest of Doe I*, 163 Idaho 274, 277, 411 P.3d 1175, 1178 (2018).

---

[4] The statutory time frame under Idaho Code § 16-2002(3)(b) to terminate parental rights has since been amended to twelve of the most recent twenty-two months. The amendment does not affect the analysis or outcome of this case.

4

# III.

## ANALYSIS

### A.      Statutory Basis for Termination

A parent has a fundamental liberty interest in maintaining a relationship with his or her child. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Doe v. State*, 137 Idaho 758, 760, 53 P.3d 341, 343 (2002). This interest is protected by the Fourteenth Amendment to the United States Constitution. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007). Implicit in the Termination of Parent and Child Relationship Act is the philosophy that, wherever possible, family life should be strengthened and preserved. I.C. § 16-2001(2). Therefore, the requisites of due process must be met when terminating the parent-child relationship. *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). Due process requires that the grounds for terminating a parent-child relationship be proved by clear and convincing evidence. *Id*. Because a fundamental liberty interest is at stake, the United States Supreme Court has determined that a court may terminate a parent-child relationship only if that decision is supported by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *see also* I.C. § 16-2009; *Doe v. Dep't of Health & Welfare*, 146 Idaho 759, 761-62, 203 P.3d 689, 691-92 (2009); *Doe*, 143 Idaho at 386, 146 P.3d at 652.

Idaho Code § 16-2005 permits a party to petition the court for termination of the parent-child relationship when it is in the child's best interests and any one of the following five factors exist: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) the parent is unable to discharge parental responsibilities for a prolonged period that will be injurious to the health, morals, or well-being of the child; or (e) the parent is incarcerated and will remain incarcerated for a substantial period of time. Each statutory ground is an independent basis for termination. *Doe*, 144 Idaho at 842, 172 P.3d at 1117.

Idaho Code § 16-2002(3)(a) defines "neglect" as any conduct included in I.C. § 16-1602(31). Section 16-1602(31)(a) provides, in pertinent part, that a child is neglected when the child is without proper parental care and control, or subsistence, medical or other care or control necessary for his or her well-being because of the conduct or omission of his or her parents, guardian, or other custodian or their neglect or refusal to provide them. Neglect also exists where the parent has failed to comply with the court's orders or the case plan in a Child Protective Act case and the Department has had temporary or legal custody of the child for fifteen of the most

5

recent twenty-two months and reunification has not been accomplished by the last day of the fifteenth month in which the child has been in the temporary or legal custody of the Department. I.C. § 16-2002(3)(b).

Doe raises four arguments on appeal: (1) the magistrate court erred in terminating his parental rights without first ruling on his due process argument that his parental rights were terminated on facts that were never adjudicated or included in the case plan; (2) the Department did not prove by clear and convincing evidence either that Child was abused or that Doe failed to protect Child from abuse; (3) the Department did not prove by clear and convincing evidence Doe neglected Child; and (4) the Department did not prove by clear and convincing evidence that termination of Doe's parental rights is in the best interests of Child. The Department argues: (1) Doe's brief fails to comply with Idaho Appellate Rule 35 and relies on evidence not in the record, which results in a waiver of Doe's claims on appeal; (2) the magistrate court did not find abuse as a statutory basis to terminate Doe's parental rights; (3) the Department's efforts at reunification are irrelevant in a termination proceeding; and (4) the magistrate court's findings on the statutory bases for which Doe's parental rights could be terminated and its finding that termination is in the best interests of Child are supported by substantial and competent evidence.

1.      **Failure to comply with Idaho Appellate Rule 35**

We first address the Department's claim that Doe has waived consideration of his arguments on appeal for failing to comply with I.A.R. 35(a)(6). Idaho Appellate Rule 35 sets out the required contents of an appellant's brief and provides that the argument section of an appellant's brief "shall contain the contentions of the appellant with respect to the issues presented on appeal, the reasons therefor, with citations to the authorities, statutes and parts of the transcript and record relied upon." I.A.R. 35(a)(6). The record in this case is 758 pages, and the transcript is 1,469 pages. The argument section of Doe's opening brief is eighteen and one-half pages. In those eighteen plus pages, there are three citations to the record. In subsection I of the argument section, there is one citation to pages 1,031-1,033 and 1,037 of the transcript, which is Doe's argument at the termination trial for a directed verdict. In subsection II, there is one citation to pages 28-29 of the record, which is the initial petition filed in the CPA case. In subsection IV, there is one citation to pages 301-302 of the transcript, which is Doe's testimony regarding his unwillingness to separate from Stepmother. Subsection III omits any reference to the record. While Doe cites to the record in support of his argument in his reply brief, that is insufficient to

6

avoid waiver. *See Dodd v. Jones*, 175 Idaho 382, 395, 566 P.3d 379, 392 (2024) (holding although the Dodds presented additional argument and authority in support of an issue inadequately supported in their opening brief, the Court would look only to the initial brief because "those are the arguments and authority to which the respondent has an opportunity to respond in the respondent's brief"). This Court will not search the record on appeal for error. *Idaho Dep't of Health & Welfare v. Doe*, 150 Idaho 103, 113, 244 P.3d 247, 257 (Ct. App. 2010). Even in an appeal from the termination of parental rights, **"**we will not consider an issue which is not supported by cogent argument and authority." *In re Doe (2013-15)*, 156 Idaho 103, 109, 320 P.3d 1262, 1268 (2014). As a result, Doe has waived consideration of all the claims raised on appeal. But even if reviewed on the merits, Doe's claims fail.

### 2. Due process claim

Doe's first argument is that the magistrate court erred in terminating his parental rights without first ruling on his due process argument. Doe's due process argument is two-fold: (1) the magistrate court erred by terminating Doe's parental rights based on facts that were never adjudicated or included in the case plan; and (2) the magistrate court erred in terminating Doe's parental rights because the Department imposed unclear conditions for reunification that were never made part of the case plan.

The United States Constitution's Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. This guarantee secures both substantive and procedural due process rights. The substantive component "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel*, 530 U.S. at 65; *see also Carver v. Hornish*, 171 Idaho 118, 123, 518 P.3d 1175, 1180 (2022). The procedural component, on the other hand, requires that there be some process to ensure that an individual is not arbitrarily deprived of his rights in violation of the state or federal constitutions. *S. Valley Ground Water Dist. v. Idaho Dep't of Water Res.*, 173 Idaho 762, 794, 548 P.3d 734, 766 (2024). Whether an individual's due process rights have been violated requires a reviewing court to engage in a two-step analysis. *Id.* First, the court "must decide whether an individual's threatened interest is a liberty or property interest under the Fourteenth Amendment." *IDHW v. Jane Doe (2024-04)*, 174 Idaho 401, 418, 555 P.3d 1091, 1108 (2024). Second, the court must determine what process is due. *Id.* A parent's ability to make decisions regarding the care, custody, and control of his children is a fundamental right

7

protected by the Fourteenth Amendment's Due Process Clause. *Carver*, 171 Idaho at 123-24, 518 P.3d at 1180-81.

In a termination of parental rights case, the procedural process that is due is defined by statute and includes notice (I.C. § 16-2008(2)); a hearing before a neutral magistrate court at which witnesses may appear and be cross-examined (I.C. § 16-2009); and that the magistrate court's findings must be established by clear and convincing evidence (I.C. § 16-2009(3)). *Doe*, 143 Idaho at 386, 146 P.3d at 652. Where the termination trial complies with these procedural safeguards, there is no due process violation. *See Idaho Department of Health and Welfare v. Doe I*, 163 Idaho 83, 87-88, 408 P.3d 81, 85-86 (2017) (holding Child failed to establish due process violation where parental rights were terminated without a trial because hearing was held in compliance with I.C. § 16-2009 and other statutory requirements were met).

### i.     Facts not adjudicated

Doe argues the Department had an obligation to "convince" Doe through an adjudication in the CPA case that abuse occurred and Stepmother caused the abuse. Short of that adjudication, Doe argues the Department violated his due process rights when the Department premised reunification on Doe's acknowledgment and acceptance of those facts, required Doe to complete a task related to those facts, and ultimately terminated Doe's parental rights based on those facts. Doe's argument fails because there is no requirement that any of the allegations of neglect be "proven" true by clear and convincing evidence in the CPA case.

The Idaho Supreme Court has repeatedly held that *allegations* of abuse are sufficient for a finding of neglect. *See In the Interest of the Doe Children v. John Doe and Jane Doe*, 163 Idaho 367, 413 P.3d 767 (2018) (mother's inability to protect her children based on allegations of abuse was substantial and competent evidence that mother neglected children); *Castro v. Idaho Department of Health and Welfare*, 102 Idaho 218, 628 P.2d 1052 (1981) (father's parental rights terminated based on allegations of abuse with substantiated injuries); *In the Interest of John Doe I and John Doe II v. State Department of Health and Welfare*, 122 Idaho 644, 837 P.2d 319 (Ct. App. 1992) (rejecting argument that parental rights may only be terminated upon finding, among other options, affirmative abuse with substantiated physical or emotional harm to child). Moreover, the statutory bases for termination can be established by circumstantial evidence. *Doe I v. Doe*, 138 Idaho 893, 900, 71 P.3d 1040, 1047 (2003) (noting abandonment may be proven by circumstantial evidence)

Doe argues that because the Department alleged Doe neglected Child by failing to recognize or admit Stepmother committed the abuse and by failing to protect Child from Stepmother, the Department "effectively put [Doe] in the position of proving that he reasonably believed and reasonably believes now that [Stepmother] did not commit the abuse." This appears to be an argument that the Department shifted the burden to Doe to prove he was a fit parent. We disagree.

In *IDHW v. Doe (2023-24)*, 172 Idaho 891, 537 P.3d 1252 (2023), Infant was taken into protective custody based on allegations that Infant's older sibling, Toddler, had been taken into the Department's custody on allegations of abuse. *Id*. at 896, 537 P.3d at 1257. At the conclusion of the Department's case-in-chief at the adjudicatory hearing, Father and Mother moved for a joint motion for directed verdict pursuant to Idaho Rule of Civil Procedure 50 and argued the Department lacked any particularized facts that related to risks to Infant's safety. *Doe (2023-24)*, 172 Idaho at 896, 537 P.3d at 1257. Parents argued the Department unconstitutionally shifted the burden of proof to Parents to prove Infant was safe, as opposed to the Department proving Infant was unsafe in Parents' care and custody. *Id*. The magistrate court denied the motion and held Infant fell within the purview of the CPA. *Id*. at 897, 537 P.3d at 1258. Parents appealed.

On appeal, Parents argued, among other things, that the magistrate court erred in denying their I.R.C.P. 50 motion. *Doe (2023-24)*, 172 Idaho at 896, 537 P.3d at 1257. The Supreme Court noted the evidence presented at the adjudicatory hearing included that Toddler had been taken into protective custody approximately four months before Infant's birth based on Toddler's exposure to methamphetamines and Toddler's broken femur and other injuries that were indicative of physical abuse; the goal in Toddler's CPA case was termination of parental rights; Parents had not been cooperative with the case plans entered in Toddler's CPA case; and Parents had not addressed any of the safety concerns regarding Toddler and all safety concerns that brought Toddler into protective custody were still concerns. *Id*. at 901-02, 537 P.3d 1262-63.

The Court noted that the burden of proof during a CPA case was a preponderance of the evidence. *Id*. at 901, 537 P.3d at 1262. The Court held the evidence presented at the adjudicatory hearing constituted substantial evidence sufficient to avoid a motion for direct verdict and "[t]he 'at risk' standard under Idaho Code section 16-1603(2) is a lower threshold, not to be confused with *actual* abuse, neglect, or abandonment required under section 16-1603(1)." *Doe (2023-24)*, 172 Idaho at 902, 537 P.3d at 1263. The Court further held that although there was no evidence

9

indicating Infant sustained the same injuries as Toddler, there was substantial and competent evidence that Infant was at risk of being subjected to the same safety concerns that brought Toddler into the Department's custody. *Id.* The Court held there was "substantial and competent evidence that Infant is *at risk* of suffering similar abuse or neglect." *Id*. The Court further noted that the law did not require Infant to suffer a broken limb to conclude he was at risk and because specific safety concerns were associated with Toddler's abuse and neglect, a reasonable person could conclude those on-going concerns created a risk that Infant would also be a victim of abuse or neglect, especially given Parents' seeming unwillingness to accept the need to change their behavior. *Id*. at 902-03, 537 P.3d at 1263-64.

The Court also addressed Parents' claim that the burden of proof was unconstitutionally shifted to them to show Infant was not at risk of being abused. *Id*. at 903, 537 P.3d at 1264. The Court contrasted the standard that applies for a magistrate court taking jurisdiction over a child pursuant to I.C. § 16-1603 with the standard for vesting custody with the Department pursuant to I.C. § 16-1619. *Doe (2023-24)*, 172 Idaho at 904, 537 P.3d at 1265. The Court found there was sufficient evidence in the case to support the magistrate court's decision to exercise jurisdiction over Infant pursuant to I.C. § 16-1603(2). *Doe (2023-24)*, 172 Idaho at 906, 537 P.3d at 1267. In doing so, the Court relied on its reasoning and holding in *Idaho Dept. of Health and Welfare v. Doe (2009-21)*, 151 Idaho 300, 256 P.3d 708 (2011). *Doe (2023-24)*, 172 Idaho at 903-05, 537 P.3d at 1264-66. Mother argued *Doe (2009-21)* was distinguishable because unlike the facts in that case, the cause of Toddler's injuries in Mother's case were unknown. *Doe (2023-24)*, 172 Idaho at 904, 537 P.3d at 1265. The Court rejected Mother's characterization that Toddler's injuries were unknown, holding:

> The cause of Toddler's injuries is *not* unknown. The magistrate court found that the cause of Toddler's injuries--facial bruising, thigh bruising, and a fractured femur--was physical abuse. While it is not known *who* in the home inflicted Toddler's injuries, this point is irrelevant for purposes of determining whether Infant was at risk of abuse or neglect. The CPA does not require a magistrate court to determine the identity of the first child's abuser in order to conclude another child in the same household is at risk of being a victim of abuse or neglect under subsection 16-1603(2)(b), particularly when the same people in the home have access to both children and the same parents are obligated to protect both children from such abuse.

*Id.* The Court further explained its holding in *Doe (2009-21)*:

10

We did not uphold the magistrate court's determination in *Doe* [*(2009-21)*] that the daughter fell under the jurisdiction of the CPA because the father admitted his abuse; we upheld it because there was sufficient evidence to support the findings that daughter was exposed to that abuse *and* that she was *at risk* of being a victim of abuse herself. Either one of these findings would be sufficient to take jurisdiction of a child under the CPA pursuant to subsection 1603(2)(b); a court need not find both. Thus, it is irrelevant here that Infant was not exposed to the abuse suffered by Toddler. The magistrate court was permitted to, and did, take jurisdiction of Infant based solely on the conclusion that Infant was *at risk* of being a victim of abuse, neglect, or abandonment.

*Doe (2023-24)*, 172 Idaho at 905, 537 P.3d at 1266.

Contrary to Doe's assertion, the Department was not required to "convince" Doe or "prove" that Child's injuries were the result of abuse or that Stepmother caused the abuse in the CPA case. Instead, the magistrate court was required to find by a preponderance of the evidence that it was contrary to the welfare of Child to remain in the home, and it was in Child's best interests for custody to be vested with the Department. This was established by the evidence that Child was exposed to abuse, and Child was at risk of being further abused.

In its adjudicatory decree, the magistrate court indicated it based its findings on the information in the verified petition, the affidavits in support of the petition, and the reports of investigation prepared by the Department and the guardian ad litem. That information included the opinion of the medical provider who treated Child and indicated Child's injuries were consistent with "inflicted trauma (e.g. child abuse)" and Child had a "high risk of further injury or death if returned to the hands of the caregiver who inflicted the injuries." That information was sufficient evidence to find by a preponderance of the evidence that Child had been exposed to abuse.

Moreover, although it was unknown at the time of the adjudicatory hearing whether it was Doe or Stepmother who inflicted the injuries, the risk of further abuse was documented in Child's medical records and thus is similarly supported in the record. At the time of the injury, there was no plausible explanation for the injuries Child suffered and both Doe and Stepmother would have had access to Child if he was returned to the home. Given that there was a high risk of further injury or death if returned to the caregivers, there was substantial evidence for the magistrate court to conclude in the CPA case that it was contrary to Child's welfare to remain in the home and that it was in Child's best interests to be placed in the custody of the Department. This was the due process to which Doe was entitled in the CPA case and that standard was met.

11

As it relates to the termination trial, the "adjudication" required was that the Department prove, by clear and convincing evidence, one of the statutory bases upon which Doe's parental rights could be terminated and that terminating Doe's parental rights is in the best interests of Child.

A similar argument regarding termination on unadjudicated facts was addressed in *In re Child of James R.*, 182 A.3d 1252 (Me. 2018). There, Child was placed into the Maine Department of Health and Human Services after being born premature and drug-affected. *Id*. at 1254. A case plan was entered and Father made progress on the case plan such that Father was permitted unsupervised visitation with Child. *Id*. at 1255. During one of the visits, Child was injured at a time when Father was the sole caregiver. *Id*. Medical providers were "very convinced" that Father's explanation of the bruises was not accurate, and the bruising was "most consistent with an inflicted injury." *Id*. Father never admitted any wrongdoing and testified at the termination trial that he was not responsible for Child's injuries. *Id*. at 1256. Father's parental rights to Child were subsequently terminated and Father appealed. *Id*. at 1254.

On appeal, Father argued his due process rights were violated because his parental rights were terminated based largely on the allegation of abuse, which Father asserted was never adjudicated. *Id*. at 1258. The Maine Supreme Court disagreed, holding Father had a full opportunity at the termination trial to challenge the Department's evidence that he inflicted the injuries and to present his own evidence on that issue, and he did both. *Id*. The Court reasoned:

> More importantly, however, the basis for a termination determination is not artificially limited to circumstances, frozen in time, that existed at some earlier date. As we have stated, the focus of the termination hearing is "not on the original reason for the children's removal from the parents' home, but on the parents' actions since that time and their ability, contemporaneous with the termination hearing and into the future, to provide safe care for [their children]." *In re Scott S.*, 2001 ME 114, ¶ 15, 775 A.2d 1144. The scope of the Department's evidence forming the basis for the judgment and the father's full participation at the hearing were fully consistent with the father's right to due process.

*In re Child of James R.*, 182 A.3d at 1258-59.

Similarly, the issue in this case was whether, at the time of the termination hearing and into the future, Doe could safely care for Child. Doe had a full, fair, and meaningful opportunity to challenge all the statutory bases upon which his parental rights could be terminated during the termination trial. Doe took full advantage of that opportunity and presented evidence to rebut the Department's allegations. During the termination trial, it became clear based on Doe's testimony

that Doe refused to believe any of the evidence that Stepmother injured Child. But Doe's failure to accept the evidence is not the equivalent of a due process violation. Consequently, Doe has failed to establish any due process violation related to the level of proof needed to support the magistrate court's findings in the CPA case or at the termination trial that Child was abused, and Stepmother caused the abuse.

### ii. Unclear case plan conditions

Doe argues the Department's "goals for reunification were nebulous, shifting, and without concrete asks associated with them, making them virtually impossible for the parents and particularly Father to accomplish." As part of that argument, Doe asserts, "If the Department had conditioned reunification on the parents acknowledging the abuse occurred, they would have had to fashion tasks for the parents that would address reducing or eliminating that future risk for reunification to occur." Doe argues that because the case plan did not require separation from Stepmother, it could not be a basis for termination of Doe's parental rights.

The case plan order was entered November 27, 2023. The goals for reunification were set out in the case plan. The case plan was designed to address the safety concern that Doe did not demonstrate an ability to protect Child, as evidenced by Child's life-threatening injuries. The goal related to this safety concern required Doe to demonstrate his ability to protect Child. There were eight written tasks to address this safety concern and goal. These written tasks required Doe to: use other methods of discipline as opposed to physical discipline; not allow others to use physical discipline with Child; demonstrate his ability to use the skills he learned at a Department-approved parenting class during visitation; submit to random drug testing at the discretion of the Department; participate in anger management classes; obtain mental health services if requested by the Department; maintain a home free of any safety hazards; and ensure firearms in the household were safely stored and out of the reach of Child. There was also a verbal task related to this safety concern and goal; that task required Doe to separate himself from Stepmother, who at the time the case plan was adopted, was not yet married to Doe. This was to address the Department's concern that Stepmother was responsible for Child's injuries. This safety concern, and the goal related to that safety concern, did not change throughout the CPA case.

Additionally, there were conditions for case closure. The first condition for case closure listed the Department's safety concern that "[Child] had life threatening injuries that were not properly explained at the time of injury." The goal associated with this concern was that Doe

13

would demonstrate the ability to protect Child. The associated task was for Doe to complete a Department-approved parenting class. For reunification and for case closure, the Department repeatedly discussed with Doe the importance of protecting Child by separating from Stepmother.

As early as February 2024, Doe was informed about the Department's expectation regarding his relationship with Stepmother, who he had not yet married. In a progress report for review hearing and permanency plan, the caseworker, when describing the efforts by the Department to finalize permanency goals, noted that in February 2024:

> The Department has regular in-person meetings with [Doe] to discuss his case plan. [Doe] is aware of the tasks the Department needs to see to reunify with [Child], such as maintaining a home where [Stepmother] is not present. [Doe] reported he is in the process of separating their homes and finding an appropriate roommate.

This expectation was reiterated in April 2024. Doe was clear about these expectations and continued to tell the Department he was separated from Stepmother, and they were no longer in a romantic relationship. For example, as noted by the caseworker in a declaration filed with the magistrate court:

> During a visit on August 2, 2024, [Doe] informed the Department he would end any relationship with [Stepmother]. The Department reiterated their expectation of [Doe] not continuing to have a relationship with [Stepmother] due to the allegations of the severe harm she caused to his child. It has also been reported by the CASA worker that [Doe] has reported to her that he has ended any relationship with [Stepmother] months ago but continues to interact with her.

In August 2024, Doe filed a motion for a review hearing and requested a thirty-day home visit. Therein, Doe stated he had a separate home from Stepmother, was not in a romantic relationship with her, and "recognizes he must act to protect [Child] from her while there are questions about her actions or an ongoing criminal case." At that time, Doe was "agreeable to any terms of a protective order or limitations on [Stepmother] contacting [Child] while in his care."

In the Department's objection, the Department noted that while it was suspected Child's injuries were the result of Stepmother's actions, it could have been Doe who caused the injuries. The Department was also concerned that Doe would not be protective and keep Stepmother away from Child, had lied to the Department about his relationship with Stepmother, continued to associate with Stepmother, and did not understand Stepmother to be a threat to Child. In support of its objection, the Department attached a declaration from the caseworker. In that declaration, the Department was clear it had ongoing safety concerns for Child due to Doe's relationship with Stepmother; there was evidence Doe and Stepmother had an ongoing relationship; and Doe

14

indicated he believed Stepmother only accidentally injured Child and once Stepmother "is found not guilty" of the criminal charges, Doe would work to reintegrate Stepmother into his life. The magistrate court denied the motion on September 19, 2024, for the following reasons: "concerns about honesty/transparency about harm to [Child]," and "concerns about significant others."

In December 2024, the progress report filed with the magistrate court details the following:

> After the last hearing, [Doe] met with LSW [] to discuss what he would need to do in order to reunify with [Child]. LSW [] explained to [Doe] he would need to separate himself from [Stepmother] due to the ongoing concerns. [Doe] reported he would not build a brick wall between him and [Stepmother] due to her being the mother of his children. [Doe] reported when his children grew up and asked why they were unable to maintain contact with their mother, he would explain to them it was Idaho CPS' fault.

This report also addressed the fact that on November 25, 2024, it was reported to the Department that Doe married Stepmother. The Department had conversations with Doe about why he failed to disclose the information in prior meetings with the Department and Doe's response was that Stepmother wanted to wait to tell her family the news.

Doe had actual notice of the case plan task that required he separate himself from Stepmother and had the ability to comply with or challenge that task. The record makes clear that the Department was concerned Stepmother was the one who harmed Child. Doe testified that he knew of Child's diagnosis of abusive head trauma. Doe further testified he was told by the Department that his relationship with Stepmother was a "real concern" because of the Department's concerns Stepmother caused Child's injuries. Doe also testified he was told multiple times that maintaining a relationship with Stepmother would be a significant barrier to reunification with Child. Doe testified that, for a while, he complied with that requirement but stayed in contact with Stepmother. He testified that despite the warnings, he reinitiated a romantic relationship with Stepmother during the CPA case and then married her.

The petition for termination of Doe's parental rights was filed January 6, 2025. The report of investigation for termination of parental rights indicated the Department "has continued to discuss the concerns regarding [Doe's] relationship with [Stepmother.]" The recommendations regarding termination of the parent/child relationship reiterated this concern relating to both Doe and Mother, and yet as late as December 2024, neither Doe nor Mother was willing to put Child's needs above their own:

> [Child] has sustained significant injuries while in the care of each of his parents that has been reported to be caused by their respective significant others. Neither parent

15

is willing to acknowledge the seriousness of these injuries and do not believe that the injuries [Child] sustained were intentionally caused by their significant others. This causes great concern for either parent's ability to be a protective caregiver and demonstrate they can put [Child's] needs ahead of their own.

Doe appears to argue the notice, opportunity, and evidentiary burden procedural due process protections were not met in the CPA case. To the extent Doe is arguing the case plan tasks were unclear and/or he did not have notice of the verbal task to separate himself from Stepmother during the CPA case in order to demonstrate the capacity to protect Child, his argument is unavailing because the Idaho Supreme Court has repeatedly and definitively ruled that an "inquiry into the Department's efforts at reunification is irrelevant to the termination of parental rights." *Idaho Dep't of Health & Welfare v. Doe*, 164 Idaho 883, 888, 436 P.3d 1232, 1237 (2019); *see also State, Dep't of Health & Welfare v. Doe (2019-31)*, 166 Idaho 357, 361, 458 P.3d 226, 230 (Ct. App. 2020) ("It is well-settled that the Department's efforts at reunification are not relevant to the magistrate court's termination decision under I.C. § 16-2005."). Moreover, there are several opportunities for immediate appellate recourse for a magistrate court's determination of the Department's reasonable efforts. As this Court previously ruled in *Doe (2019-31)*, 166 Idaho at 360-61, 458 P.3d at 230-31, "[t]here is a statutory right to appeal at several points during the pendency of the child protection proceeding." Idaho Code § 16-1625(1) sets forth this right and provides, in part, that an aggrieved party may appeal "[a]n adjudicatory decree," "[a]ny order subsequent to the adjudicatory decree that vests legal custody of the child in the department," or "[a]ny order subsequent to the adjudicatory decree that authorizes or mandates the department to cease reasonable efforts to make it possible to return the child to his home." I.C. § 16-1625(1)(a)-(c).

Although counsel for Doe alleges she objected "numerous times" to the requirement that Doe separate from Stepmother, there is no citation to the record to support this claim. Nothing in the record indicates there was any challenge to this task; the record appears to indicate the opposite, because as noted above, this condition was addressed in a hearing by the magistrate court when Doe's request for extended visitation was denied. Moreover, if counsel objected, those objections establish that Doe had notice of the tasks and it undercuts Doe's argument that he had no notice of this task.

The record belies Doe's claim that he had no notice of the task and that it was not a task approved by the magistrate court. If Doe had concerns regarding the magistrate court's findings

16

following the adjudicatory hearing that Child was abused, Doe could have appealed pursuant to I.C. § 16-1625(a). The failure to challenge the case plan task in the CPA case, however, does not implicate Doe's due process rights in the termination proceeding.

Doe next argues that he could not appeal because it was not what was in the case plan, but rather, what was not in the case plan--the verbal task that he separate from Stepmother--that he challenged. We disagree. As noted above, Doe had actual notice of this task and could have raised in the magistrate court whether it was a required case plan task. For example, when Doe filed his motion for extended visitation, his relationship with Stepmother was one of the bases upon which the Department objected to the extended visitation. The court minutes from the hearing on the motion indicate the magistrate court denied the motion in part based on Doe's relationship with Stepmother. We note that, neither the transcript of that hearing or any of the CPA hearings is included in the record on appeal. It is the responsibility of the appellant to provide a sufficient record to substantiate his or her claims on appeal. *Powell v. Sellers*, 130 Idaho 122, 127, 937 P.2d 434, 439 (Ct. App. 1997). Regardless, there is no reason Doe could not have challenged the condition at that hearing and then filed an interlocutory appeal from the denial to modify that condition of the case plan if he disagreed with the ruling.

It appears part of Doe's due process argument is that the Department did not comply with I.C. § 16-1621, which sets forth the requirements for a case plan hearing when there are no aggravating circumstances. However, in his opening brief, Doe makes no cogent argument related to the statutory requirements or ties any alleged statutory violations to his due process challenge; as a result, he has waived this argument. *See In re Doe (2013-15)*, 156 Idaho at 109, 320 P.3d at 1268 (holding even in an appeal from the termination of parental rights, "we will not consider an issue which is not supported by cogent argument and authority"). However, even when considered on the merits, the argument fails.

Idaho Code § 16-1621(3)(c) requires that if, following a case plan hearing, the magistrate court determines the best interests of the child is served by adopting the proposed case plan, the case plan filed by the Department shall set forth reasonable efforts that will be made so the child can return home, including a goal of reunification and a plan for achieving that goal:

> The reunification plan shall identify all issues that need to be addressed before the child can safely be returned home without department supervision. The court may specifically identify issues to be addressed by the plan. The reunification plan shall specifically identify the tasks to be completed by the department, each parent or

17

others to address each issue, including services to be made available by the department to the parents and in which the parents are required to participate, and the deadlines for completion of each task.

The purpose of the written case plan tasks, adopted by the magistrate court and agreed to by the parents, is to provide notice to the parents what the expectations are for reunification and case closure. And where a parent has acknowledged those tasks, it is much easier to find a parent had actual notice of the task and an opportunity to comply or challenge the task. While it could be the case that a verbal instruction may fail to comport with due process requirements, that is not the case here. As discussed above, Doe had actual notice of the case plan task, he complied with the task for a period of time, and it appears the substance of the task was addressed by the magistrate court at Doe's request for extended visitation with Child. Doe's subsequent failure to separate from Stepmother had nothing to do with his lack of notice, his lack of understanding of the requirement, or his inability to comply. Instead, Doe simply chose to ignore this requirement and solidify his relationship with his Child's abuser.

Doe argues this case is so similar to *Idaho Dept. of Health and Welfare v. Doe*, 150 Idaho 752, 250 P.3d 803 (Ct. App. 2011), that the outcome should be the same. In that case, the children were removed based on allegations of abuse and neglect. *Id*. at 753, 250 P.3d 804. A case plan was subsequently approved by the magistrate court; the case plan assigned Father tasks focused on Father achieving and maintaining sobriety. *Id*. at 754, 250 P.3d at 805. After a rocky start, Father began working the case plan and complied with many of the tasks, but not all. *Id*. The guardian ad litem noted Father had "made every effort to work his case plan" and was "earnest and anxious to comply with all that is asked of him." *Id*. at 754-55, 250 P.3d at 805-06. The Department nonetheless filed a petition to terminate Father's parental rights. *Id*. at 755, 250 P.3d at 806. The basis for the petition was that Father neglected his children prior to the children being taken into the Department's custody and the neglect continued by Father's failure to complete the case plan. *Id*. Following the termination hearing, Father's parental rights were terminated and Father appealed. *Id*. at 756, 250 P.3d at 807.

This Court concluded that the magistrate court erred in terminating Father's parental rights. We reasoned:

> The substantive focus of the case plan called for Father to address three major deficiencies before the children would be returned to him: he was required to overcome his alcohol abuse, build a healthy relationship with his children and gain parenting skills, and achieve financial stability so that he could provide a

proper home. The magistrate's findings gave little or no acknowledgement to the strides that Father had made toward each of these primary goals.

*Id.* at 758, 250 P.3d at 809. We then analyzed each of the three above-listed goals and ultimately concluded the magistrate court did not address the uncontroverted evidence that for quite some time, Father had faithfully worked toward addressing each principal goal of the case plan. *Id.* at 758-59, 250 P.3d at 809-10. This Court ultimately held the magistrate court erred by focusing on Father's behavior prior to the children's removal "while disregarding or giving minimal attention to the compelling evidence of Father's success" in addressing the goals of the case plan. *Id.* at 763, 250 P.3d at 814.

That case, however, is distinguishable. While it is true this Court noted the magistrate court in that case found Father failed to comply with case plan tasks that were not written in the case plan, that was not the focus of the reasoning or ultimate holding in the case. Additionally, the only basis upon which the Department sought to terminate Father's parental rights in that case was neglect by failing to comply with the case plan. That is not the case here, as the Department alleged three other statutory bases upon which Doe's parental rights could be terminated. Finally, in the above case, there was "compelling evidence" that Father substantially complied with the three substantive goals set forth in the case plan. Here, as discussed above, the substantive goal of the case plan was to address the safety concern that Doe had not demonstrated the ability to protect Child "as evidenced by the injury that happened to [Child]." The goal related to this concern required Doe to demonstrate his ability to protect Child. At the time of the termination trial, there was no "compelling evidence" that Doe had substantially complied with this goal. His unwillingness to accept that Child was abused, and Stepmother caused the abuse, created the same risk to Child that brought Child into the Department's custody. As such, and unlike in the above case, the magistrate court did not disregard compelling evidence of Doe's success in dealing with the safety concerns related to Child.

Doe also cites to *Doe (2009-21)*, 151 Idaho at 300, 256 P.3d at 708, in support of his argument. In that case, an infant was taken into protective custody following his admission to the hospital where he was diagnosed with and treated for a broken femur and two fractured clavicle bones; x-rays indicated the injuries resulted from at least two separate incidents. *Id.* at 302, 256 P.3d at 710. Father was arrested and incarcerated as a result of the injuries. *Id.* The Department then took protective custody of an older sibling. *Id.* An adjudicatory hearing was later held, at which Mother invoked her Fifth Amendment right not to incriminate herself. *Id.* at 309, 256 P.3d

at 717. As a result, the magistrate court concluded that although there were no allegations or evidence Mother abused the children, for the children to be returned, the magistrate court required assurance that the children would be safe and "Mother [would] choose the children over the influence of her husband." *Id*. The magistrate court vested custody of the children with the Department. Mother appealed. *Id*. at 303, 256 P.3d at 711.

Mother made three arguments on appeal, but as relevant here, Mother argued that because Father was solely responsible for the infant's injuries, and Father was incarcerated as a result, it was not in the best interests of the children to vest custody with the Department when she was able to care for the children. *Id*. at 309, 256 P.3d at 717. Mother also argued the magistrate court impermissibly shifted the burden to her to prove she was a fit parent; the Idaho Supreme Court agreed. *Id*. The Court's reason for so holding is especially relevant:

> In this case, there were no allegations that [Mother] abused, neglected or abandoned her children. The magistrate recognized these facts but felt that there were not adequate assurances that the children would be safe at home without a safety plan yet in place and feared that [Mother] would [not] choose the children over her husband. *There was no direct evidence that* [*Mother*] *would choose her husband over her children. . . .* There was no evidence of [Mother's] complicity in inflicting the injuries on [infant] or that [Mother] was aware of [Father's] violent behavior toward [infant] when the injuries were being inflicted, and *the evidence showed she took appropriate, timely action to protect* [*infant*] *after he sustained the injuries*.

*Id*. at 309-310, 256 P.3d 717-18 (emphasis added).

The above case is distinguishable on several grounds. First, it was an appeal from a decision to vest legal custody of the children with the Department following an adjudicatory hearing, not a termination hearing, so a different burden of proof applied. Second, the Court's opinion was premised on the facts that there was no evidence Mother would choose her husband over her children and that she protected the infant after he was injured. That is not the case here because the direct evidence indicates that Doe has chosen Stepmother over Child. Doe's testimony at the termination trial made it clear that he does not believe Stepmother injured Child and he will not separate himself from Stepmother to ensure Child has a home where he will not be left in Stepmother's care. As such, the above case does not provide a useful analogy to this case such that it's holding would control.

Doe has failed to establish any due process violations related to the CPA proceeding or the termination hearing, to the extent his parental rights were terminated on unadjudicated facts or an unclear case plan.

### iii.     Due process requirements in termination proceedings

The statutes addressing termination of parental rights set forth the due process required. Idaho Code § 16-2006 sets forth the requirements for the content of the petition for termination of parental rights, which addresses any due process notice claims. The petition here clearly put Doe on notice that the factual premise for seeking termination of his parental rights was his inability to protectively parent Child. First, the petition alleged Doe neglected Child because Child "is without proper parental care and control, or subsistence, medical or other care or control necessary for their well-being, because of the conduct or omission of their parents." The facts underlying the allegation were:

> While at [Doe's] home in Idaho, [Child] was again abused and had to be hospitalized. [Doe's] girlfriend is charged with abusing the child. [Doe] has consistently downplayed the injury to the child and defends his girlfriend's position. He does not act in a protective manner to prevent further abuse from occurring. Neither parent has put safety measures in place to ensure that the child is not exposed to future abuse. Neither parent has developed sufficient skills to protect their child and provide him with the care and control necessary.

Second, the petition alleged that Doe neglected Child by being unable to discharge his parental responsibilities. This factual allegation was supported by a report prepared by the caseworker and attached to the petition as Exhibit A. Therein, the caseworker indicated that Doe was not able to recognize the severity of Child's injuries and did not understand how his continued relationship with Stepmother could impact Child's safety in the future. The caseworker noted:

> [Doe] has continued to demonstrate that he is not able to recognize the seriousness of his son's injuries & is unwilling to articulate a plan on how he can ensure [Child's] safety in the future. He continues to be involved in a relationship with the person who injured [Child] & is unable to recognize how this relationship impacts his child's safety.

The petition also alleged Doe neglected Child by failing to complete the case plan. Finally, the petition alleged Doe was unable to discharge his parental responsibilities, and such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals, and/or well-being of Child. This allegation was supported by the same facts set forth in Exhibit A, referenced above. In addition to the facts in Exhibit A, the petition also noted

21

the parents have not been able to remove the child's abusers from his life and have not otherwise established sufficient safety measures in order to make sure that the child is not further abused. The parents have not taken the child's injuries seriously and have not taken advantage of services meant to mitigate concerns to the child's safety.

Doe never challenged the petition as alleging unclear grounds, likely because there is nothing unclear about the facts alleged in the petition or that those facts formed the basis for the Department's petition to terminate Doe's parental rights. While Doe may have disagreed with those facts, that does not render the petition unclear. The facts and bases set forth in the petition constitute actual notice and there is no due process notice violation on this ground.

Next, I.C. § 16-2009 sets forth the due process requirements related to the termination hearing: a parent is entitled to a hearing, to be represented by counsel if indigent, and all findings must be based upon clear and convincing evidence. Doe was given a hearing, he was represented by counsel, and he had the opportunity to present evidence. As discussed below, the magistrate court's findings were based on clear and convincing evidence. As a result, Doe has failed to establish a procedural due process violation in this case.

Moreover, although the magistrate court did not address Doe's due process argument prior to finding the statutory bases upon which Doe's parental rights could be terminated, as discussed above, Doe suffered no due process violation during the termination proceeding. As a result, we find no error in the magistrate court's decision on this issue.

### 3. Clear and convincing evidence

Doe argues the Department did not prove abuse as a statutory basis for terminating Doe's parental rights by clear and convincing evidence. As part of this argument, Doe asserts the Department failed to establish by clear and convincing evidence that Child was abused by anyone because there was conflicting testimony by the medical experts. The Department argues Doe is asking this Court to reweigh the credibility of the witnesses, which the appellate courts do not do. We agree with the Department.

First, Doe argues the Department did not prove abuse as a statutory basis for termination. However, while that was an allegation in the CPA petition, it was neither a basis upon which the Department sought to terminate Doe's parental rights in the termination proceeding nor a basis upon which the magistrate court found Doe's parental rights could be terminated. As such, we decline to further address the argument.

22

Second, Doe argues he is not asking this Court to reweigh the evidence, but rather, to assess the "quantum of proof provided by the [Department]." Doe argues there is no objective evidence for the magistrate court to find the Department's expert, Dr. Antoinette Laskey, more credible than Doe's medical expert, Dr. Robert Rothfeder. Additionally, Doe argues this Court should find Dr. Rothfeder's opinion more credible and adopt his conclusion regarding the causation of Child's injuries. This is a clear invitation for this Court to review the evidence presented to the magistrate court, reweigh the evidence, and reach a different conclusion regarding the credibility of the experts, the factual findings of those experts, and, subsequently, the factual causation finding of the magistrate court. We decline to do so.

At the termination trial, the curriculum vitae of Dr. Laskey was admitted as an exhibit. Dr. Laskey's curriculum vitae indicated she was board certified in pediatrics with a subspecialty of child abuse. Dr. Laskey also taught "Pediatrics (Child Protection and Family Health)" at the University of Utah School of Medicine. Doe stipulated that Dr. Laskey was a pediatric expert with a subspecialty in child abuse and was qualified to give opinion testimony as to causation of injuries. Dr. Laskey was the pediatrician who participated in the care, treatment, and diagnosis of Child and reviewed Child's CT and MRI scans. Dr. Laskey testified that based on the mix of blood and spinal fluid in Child's brain, the brain bleed was an active, new brain bleed. Blood could also be seen in the back of Child's eyes, specifically, in all four quadrants of his retinas, which Dr. Laskey testified was a consistent symptom of "significant trauma, like abusive head trauma." Child's skeletal exam was normal, and no bleeding was noted on his scalp or forehead. Dr. Laskey did not believe that the bruising present on Child was consistent with the explanation of toys being thrown at Child, which was offered by Doe and Stepmother. Dr. Laskey concluded that Child had suffered nonaccidental abusive head trauma that could have been life threatening.

Doe presented expert testimony from Dr. Rothfeder, a retired emergency medicine doctor, but did not admit Dr. Rothfeder's curriculum vitae into evidence. Dr. Rothfeder was qualified as an expert in internal medicine, emergency medicine, and trauma treatment or medicine. His medical practice was in emergency medicine, but he stopped seeing patients in 2014. Since then, Dr. Rothfeder has worked as a forensic medical consultant. Dr. Rothfeder disagreed with Dr. Laskey's ability to diagnose abusive head trauma without collateral indicators of abuse and said that he could not decisively determine the acute or chronic nature of Child's brain bleed through a CT scan.

23

The magistrate court resolved the conflicting expert testimony in favor of Dr. Laskey. The magistrate court found:

> Dr. Laskey possesses specializations relevant to this matter, above and beyond those of Dr. Rothfeder. Dr. Laskey's curriculum vitae demonstrates very current involvement with the issues surrounding diagnosis and treatment of children who have suffered abuse. Dr. Rothfeder's experience is far more removed, but[5] in subject matter specialization and current involvement in the field. In addition, Dr. Laskey had access to MRI scans that helped her formulate her opinion on the cause and age of the bleed.

Having resolved the credibility issue, the magistrate court then made factual findings regarding the nature and cause of Child's injuries. The magistrate court found: (1) "[Child] suffered an abusive head trauma, within the 48 hours prior to his head CT scan at PRMC"; (2) Dr. Laskey met with Doe and explained the diagnosis of abusive head trauma; (3) Child exhibited symptoms while in Stepmother's sole care and Stepmother pleaded guilty to misdemeanor injury to a child related to Child 's injuries and served a six-month sentence as a result of her plea; (4) Stepmother was the cause of the abusive head trauma to Child; and (5) at the time Child was injured, Doe was informed about the Department's concerns that Stepmother caused the injuries and that because of the safety concerns, remaining in a relationship with Stepmother was a barrier to Doe's reunification with Child. The magistrate court found Stepmother's guilty plea to be compelling, but not controlling, evidence that Stepmother caused Child's injuries. The magistrate court also considered Stepmother's testimony that she pleaded guilty to the misdemeanor to avoid a felony conviction.

The magistrate court further found that, despite the Department's advisements and warnings, Doe supported Stepmother's version of the cause of Child's injuries (that her children threw toys at Child's face) and, while Doe believed Child was injured in Stepmother's care, Doe did not believe Stepmother caused Child's injuries and Doe wished to "stand by the woman he loves." Finally, the magistrate court concluded that Doe and Stepmother deceived the Department regarding their continued romantic involvement in the time leading up to their marriage.

The magistrate court ultimately concluded Doe neglected Child by refusing to acknowledge Child was the victim of abuse by Stepmother and that denial made Doe unable to discharge his parental responsibilities to and for Child. Instead of taking steps to separate Child from Stepmother, the magistrate court found Doe "increased his involvement in a relationship with

---

5    It appears this is a typographical error and should be the word "both."

[Stepmother]." The magistrate court found that this inability to discharge parental responsibilities will be injurious to the health, morals, and/or well-being of Child, and it has already caused Child harm on "at least two very serious occasions."

On appeal, this Court will not disturb the magistrate court's decision to terminate parental rights if there is substantial, competent evidence in the record to support the decision. *Doe v. Doe*, 150 Idaho 46, 49, 244 P.3d 190, 193 (2010). As such, findings are competent, so long as they are supported by substantial, albeit possibly, conflicting, evidence. *Doe*, 148 Idaho at 246, 220 P.3d at 1065. Substantial, competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Doe*, 150 Idaho at 49, 244 P.3d at 193. This Court must conduct an independent review of the record but must draw all reasonable inferences in favor of the magistrate court's judgment, as the magistrate court has the opportunity to observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive and to judge the character of the parties. *In Interest of Doe I*, 163 Idaho at 277, 411 P.3d at 1178.

Doe's argument that the Department was required to "eliminate [Dr. Rothfeder's] opinion as implausible" for the magistrate court to conclude Dr. Laskey was the more credible witness is not persuasive. Precedent is clear that, "findings are competent, so long as they are supported by substantial, albeit possibly, conflicting, evidence." *Doe*, 148 Idaho at 246, 220 P.3d at 1065 (quoting *Doe*, 142 Idaho at 177, 125 P.3d at 533). Thus, merely because conflicting evidence was presented does not mean the magistrate court's factual findings are not established by clear and convincing evidence. Although Doe alleges certain medical evidence was inadequately considered by Dr. Laskey, that argument was made to and rejected by the magistrate court. The magistrate court considered all the testimony, including the testimony now challenged on appeal, and nonetheless found Dr. Laskey more credible than Dr. Rothfeder. Doe's disagreement with that credibility assessment notwithstanding, the record reflects there is "such evidence a reasonable mind might accept," to support the magistrate court's conclusion that Dr. Laskey was the more credible witness.

In essence, Doe appears to argue that despite the clear and convincing evidence Stepmother caused Child's life-threatening injuries, the Department failed to prove, to Doe's satisfaction, that he had reason to believe Stepmother presented any risk of harm to Child. Absent that "proof," argues Doe, the magistrate court could not find by clear and convincing evidence that Child was abused and Stepmother caused the abuse. We disagree. While Doe was free to disregard the

25

evidence, that is entirely irrelevant to an analysis of whether the magistrate court's findings are supported by substantial evidence. Doe does not dispute that Child was injured while in Stepmother's care and that Stepmother pleaded guilty to a misdemeanor charge of injury to a child. Doe's argument that Stepmother's guilty plea was entered pursuant to *Alford*[6], and thus, is insufficient to establish factually that Stepmother caused Child's life-threatening head trauma, is unpersuasive. As a legal matter, an *Alford* plea is the functional equivalent of a guilty plea and will be treated as such. *See State v. Coffin*, 104 Idaho 543, 547-48, 661 P.2d 328, 332-33 (1983). As a factual matter, while it is true the Department could not *make* Doe believe Stepmother caused Child's injuries, to the extent Doe chose to ignore all the evidence with which he was presented simply reinforces the magistrate court's conclusion that Doe failed to recognize the risk that existed for Child. Considering all the evidence, the magistrate court concluded, "If [Doe] has not been convinced yet, his judgment is sufficiently impaired so as to prevent him from properly caring for [Child]." We agree.

Doe's challenge to each of the magistrate court's findings regarding the statutory bases for terminating Doe's parental rights rests on his assertion that there was not clear and convincing evidence that Child was abused and Stepmother caused Child's injuries. We disagree. In this case, there was a sufficient factual basis for the magistrate court to find Doe neglected Child. Doe's unwillingness to recognize and address those circumstances supports the magistrate court's finding of neglect on two, alternate statutory bases: (1) Doe neglected Child by failing to provide proper parental care and control; and (2) Doe neglected Child based on Doe's inability to discharge his parental responsibilities. It similarly supports the magistrate court's finding that Doe's parental rights were subject to termination because he was unable to discharge his parental responsibilities, and such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals, or well-being of Child.

Each statutory ground is an independent basis for termination of Doe's parental rights. *Interest of Doe I*, 166 Idaho 57, 454 P.3d 1140 (2019). As a result, we affirm the magistrate court's conclusion that Doe neglected Child pursuant to I.C. §§ 16-2005(1)(a)(ii), 16-2002(3)(a), and 16-1602(31)(3)(a) and (b) because Child was without proper parental care and control, and because Doe was unable to discharge his parental responsibilities, respectively. We also affirm the

---

[6]     *See North Carolina v. Alford*, 400 U.S. 25 (1970).

26

magistrate court's finding that Doe was unable to discharge his parental responsibilities pursuant to I.C. § 16-2005(1)(a)(iv). Consequently, we need not address whether the magistrate court erred in finding Doe neglected Child by failing to comply with the case plan requirements.

**B.     Best Interests**

Doe makes two arguments regarding the magistrate court's finding that it is in Child's best interests to terminate Doe's parental rights. First, Doe argues the magistrate court improperly relied upon Doe's relationship choice, his alleged dishonesty regarding his on-going relationship with Stepmother, his housing instability, and speculation about potential future custody disputes. Second, Doe argues that because the Department failed to prove Child's injuries were the result of physical abuse, the Department cannot prove it would be in Child's best interests to terminate Doe's parental rights to protect Child from future harm. The Department argues the magistrate court did not err because Doe does not have stable housing, has not demonstrated strong parenting skills, and has denied there is a safety threat to Child.

Once a statutory ground for termination has been established, the trial court must next determine whether it is in the best interests of the child to terminate the parent-child relationship. *Tanner v. State*, *Dep't of Health & Welfare*, 120 Idaho 606, 611, 818 P.2d 310, 315 (1991). When determining whether termination is in the child's best interests, the trial court may consider the parent's history with substance abuse, the stability and permanency of the home, the unemployment of the parent, the financial contribution of the parent to the child's care after the child is placed in protective custody, the improvement of the child while in foster care, the parent's efforts to improve his or her situation, and the parent's continuing problems with the law. *Doe (2015-03) v. Doe*, 159 Idaho 192, 198, 358 P.3d 77, 83 (2015); *Idaho Dep't of Health & Welfare v. Doe*, 156 Idaho 103, 111, 320 P.3d 1262, 1270 (2014). A finding that it is in the best interests of the child to terminate parental rights must still be made upon objective grounds. *Idaho Dep't of Health & Welfare v. Doe*, 152 Idaho 953, 956-57, 277 P.3d 400, 403-04 (Ct. App. 2012).

The magistrate court found that terminating Doe's parental rights is in Child's best interests because Doe failed to take steps to protect Child while Child was in Mother's custody; failed to protect Child from Stepmother; and has continued to make decisions that would place Child at future risk if Child was returned to Doe. The magistrate court also found that Doe had not obtained appropriate housing and had a significant amount of time to address the safety concerns but failed

27

to do so. The magistrate court found Child deserved permanency and the foster parents were willing to provide Child with that permanency.

First, we disagree with Doe's claim that his parental rights were terminated based on potential custody disputes, as that does not appear in the relevant section of the magistrate court's order, and Doe does not cite to the record for this proposition. Second, we need not address whether the magistrate court erred in considering the risk to Child while in Mother's custody or Doe's housing situation because even without that evidence, there was substantial and competent evidence to support the magistrate court's other conclusions.

Doe testified at the termination trial that he believed Stepmother did not hurt Child. He further testified that he would not end his relationship with Stepmother unless he was presented with "undeniable facts or if I feel like our expert's medical testimony can't adequately cover the incident." Doe further testified that, "Ultimately, nobody is ever going to have definitive proof of what happened in that apartment. Otherwise, we'd have it by now." Finally, Doe testified that he believed Stepmother was innocent and did not believe Stepmother hurt Child.

The report of investigation for terminating Doe's parental rights, which was considered by the magistrate court, included information from Child's medical records from the treating hospital. The records noted Child's injuries "cannot plausibly be explained by accidental injury, preexisting medicines, reasonable discipline, or benign events. Therefore, these injuries should be considered consistent with inflicted trauma (e.g., child abuse)." The records further opined that Child was "at high risk of further injury or death if returned to the hands of the caregiver who inflicted these injuries." It was also an undisputed fact that Child was in Stepmother's sole care when the injury occurred, and Stepmother pleaded guilty to misdemeanor injury to hild and served six months in jail following her conviction.

Despite those "undeniable facts" regarding the extent and cause of Child's injuries, Doe not only maintained a relationship with Stepmother, but solidified that relationship by marrying her. Doe's adamant and irrational unwillingness to accept Stepmother was the cause of Child's injuries, and the extent of the injuries, means Doe failed to implement any protective parenting as it related to Stepmother's access to Child. The risk of Child being left alone with Stepmother--the same situation that led to Child's injuries in this case--create a high likelihood of further injury or death for Child. Doe's unwillingness to protect Child, and his willingness to return Child to the same situation that caused Child's injuries in the first instance, is substantial and competent

28

evidence to support the magistrate court's finding that terminating Doe's parental rights is in Child's best interests.

Additionally, the evidence showed that the foster mother is Child's biological great-grandmother, and that Child and Mother lived with her following Child's birth. The foster mother testified she hoped to adopt Child if she was permitted to do so, and her husband was also willing and able to adopt Child.

We hold that there is substantial and competent evidence to support the magistrate court's finding that termination of Doe's parental rights is in the best interests of Child.

## IV.

## CONCLUSION

Doe's failure to comply with I.A.R. 36 results in a waiver of his claims on appeal. But even reviewed on the merits, Doe failed to establish any due process violation and failed to establish the magistrate court erred in finding three, alternate statutory bases for terminating Doe's parental rights or that terminating Doe's parental rights is in the best interests of Child. The magistrate court's judgment and decree terminating Doe's parental rights is affirmed.

Chief Judge TRIBE and Judge LORELLO **CONCUR**.